UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

Todd County, Wadena County and Otter
Tail County, municipal subdivisions of the
State of Minnesota

       Plaintiffs/Counterclaim
       Defendants/Debtors,

vs.

Barlow Projects, Inc., a Colorado
corporation,

       Defendant/Counterclaimant/Judgment
       Creditor/Plaintiff on Supplemental
       Complaint,

vs.

Minnesota Counties Insurance Trust,

       Garnishee/Defendant on
       Supplemental Complaint.

Civil File No.: 04-CV-4218 ADM/RLE

**MINNESOTA COUNTIES
INSURANCE TRUST'S
MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT**

## INTRODUCTION

This matter is presently before the Court upon the Cross-Motions for Summary

Judgment by Barlow Projects, Inc. ("Barlow") and Defendant.  The Minnesota Counties

Insurance Trust's ("MCIT") motion for summary judgment should be granted for the

following reasons:  (1) Judicial Review of the decision of the challenged decision of the

MCIT Board of Directors has been waived; (2) the Counterclaim of Barlow Projects, Inc.

is based upon, and arises out of breach of contract:  claims which are not provided

coverage pursuant to the Minnesota Counties Insurance Trust's Coverage Document; and

(3) the Counterclaim of Barlow Projects, Inc, alleges intentional acts, which are also excluded from coverage pursuant to the Minnesota Counties Insurance Trust's Coverage Document.

## FACTS

### 1.    Background Facts

This matter arises out of the refurbishment of a trash incinerator facility located near Perham, Minnesota and the contractual agreements surrounding this refurbishment. The incinerator was constructed in 1985 and, in 1998, became owned by the City of Perham.

On November 24, 1998, Otter Tail County entered into a consulting services contract with Barlow Projects, Inc. ("Barlow") to provide a feasibility study for the technical and economic evaluation of the possibility of refurbishment and long-term operation of the facility. (Zylstra Aff. Ex. A.)

Subsequently, the City of Perham entered into a contract with Barlow for the renovation and conversion of the incinerator with the plan of selling electricity to a local power company.  This contract was formally known as the Facility Modification Agreement or "FMA.." (Zylstra Aff. Ex. B.) In addition, the City of Perham entered into an Operations and Maintenance Agreement or "O&M" providing Barlow with the exclusive rights to operate and maintain the incinerator facility for ten years. (Zylstra Aff. Ex. C.)

During the same time that the O&M and FMA contracts were being executed between Barlow and the City of Perham, Todd, Wadena and Otter Tail Counties ("the

2

Counties") also entered into contracts with the City of Perham. (Zylstra Aff. Ex. D, E, F.) These contracts indicated that the Counties were required to deliver a specific tonnage of waste to the City of Perham incinerator for a fee known as a "tipping fee." (Id.) The Counties agreed to deliver the specified tonnage for an open-ended price for the duration of 20 years. (Id. at pp. 8, 16, 19.) Additionally, the Counties' contracts with the City of Perham indicated that the Counties would provide capital for the refurbishment project and would be responsible for losses if the incinerator was unsuccessful. (Id. at pp. 1, 10.) Conversely, however, the contracts also allowed the Counties the opportunity to reclaim some of the incinerator's income through the sale of electricity generated by the incinerator as well as through steam sales to local businesses. (Id. at p. 17.)

The Counties' response to Barlow's motion to dismiss the Counties' suit in the underlying Barlow action, provides an excellent summary of the plethora of references to the Counties contained within the O&M. It states in pertinent part:

> -- In Article II, "Counties(y)" are defined as "The County and other counties, including Otter Tail, Wadena, Todd, Tri-County, or other Counties *under put or pay contracts* with the City to deliver Acceptable Waste to the Facility." (emphasis added)
>
> -- "Finance Date" is defined as "The date on which the Bonds are issued …to finance the retrofit of the Facility, which in no event shall occur before *all Counties commit to a put or pay contract.*" (emphasis added)
>
> -- "Waste Contracts" are defined as "The agreements between the City and Counties for delivery of Acceptable Waste to the Facility."
>
> * * *

--      Section 3.03 includes the Counties in the Dispute Resolution Committee process.

* * *

--      Section 3.11 requires that, in the event of damage or destruction, any changes to the Operating Fee, or other changes to Facility Costs, or the Annual Facility Budget shall be satisfactorily negotiated *with the Counties*. (emphasis added)

--      Section 4.01 requires that the Annual Facility Budget shall be reviewed and approved by the County Coordinating Committee.

--      Section 4.02 requires the Facility Manager (provided by Barlow) to meet with the County Coordinating Committee and County board meetings.

--      Section 4.10 provides that personnel hired by Barlow shall not be considered to be the Counties' personnel.

* * *

--      Section 11.02 purports to bind the Counties to arbitration in certain instances.

(Zylstra Aff. Ex. W pp. 5-6.)

The Counties were substantially involved in the drafting of and revisions to all of the aforementioned contracts, both between the Counties and Barlow and between the City of Perham and Barlow. (Zylstra Aff. Ex. S pp. 46, 48, 50-52, 53, 86, 98, 106; Ex. T; Ex. U.) On November 1, 2000, David Hauser, Otter Tail County Attorney, provided significant review and recommendations regarding the contracts. Specifically, regarding the O&M, Attorney Hauser provided significant commentary regarding contract provisions for the escalation of fees. (Ex. T.) Indeed, Michael Hanan, Solid Waste

4

Director for Otter Tail County, testified in the underlying <u>Barlow</u> suit as to the following regarding the relationship between the City of Perham and the Counties:

> Q:      Before the – the amendment – well let me even do it this way.  Before the lawsuit was commence – the lawsuits were commenced in probably September of 2004 did you hear any of the participants in the project describe the Perham project as a joint venture?   And I'm talking about actually using those terms.
>
> **A.      The exact terms joint venture I don't remember. I think that the parties treating things that way but…**
>
> Q:      And what do you mean by that?
>
> A:      **Well, if you read the County Coordinating Committee minutes over the – over time, you'll – you'll come to understand that the – that the groups had a lot of reliance on what the other parties did.  You know, if – if the counties don't' deliver their waste, the facility's short waste. It's just over the years the groups have-have been very much trading information, trading that type of data that – I don't know – joint venture.**
>
> \* \* \*
>
> Q:      Are you aware of any written agreements to which the counties are a party other than the waste delivery agreements that relate to operation or ownership of the Perham facility?
>
> A:      **Yes I am**
>
> Q:      And what agreements are those?
>
> A:      **Ash disposal agreements.**
>
> \* \* \*
>
> A: \* \* \* **That's a good example.   The ash disposal agreements are signed by the county that's delivering the waste, Otter Tail County and the City of Perham.   So I mean, that's one way that you say, Well, this looks like everybody was doing things together.**

(Zylstra Aff. Ex. S pp. 176-78.)

The sentiment that the Counties and the City were jointly involved in the incinerator project was echoed by Robert Louiseau, City Manager for the City of Perham. Mr. Louiseau testified:

> **A.     Now this is my- this is my own opinion so I'm going to tell you what I- I believe to some degree that the waste delivery agreements create some kind of a joint powers or joint effort between the city and the- and the counties.**

(Zylstra Aff. Ex. X p. 199.)

## 2.     The Operation of the Facility and the Cancellation of the O&M

The incinerator facility began experiencing problems following its retrofit, including a turbine overspin. It did not produce the revenue expected by the Counties as estimated in the Waste Management and O&M contracts. (Zylstra Aff. Ex. AA.) As a result of these budgetary and operational problems, the Counties became dissatisfied with the terms of both their contracts with the City of Perham and their contracts with Barlow. (Zylstra Aff. Ex. BB, CC.) The Counties began to discuss taking a hard stance with Barlow and renegotiating the contracts. (Id.)

Rather than renegotiate, the Facility Coordinating Committee, formed of all County members, unanimously passed a motion directing the City of Perham to proceed with termination of Barlow as the operator of the facility. (Zylstra Aff. Ex. EE.)

Additionally, on December 2, 2003, January 20 and January 23, 2004, respectively, the Counties demanded that the City of Perham terminate the O&M with Barlow, indicating to the City of Perham that if Perham would refuse to terminate the

O&M, the City of Perham itself would be in default of the contracts with the Counties. (Zylstra Aff. Ex. Y, FF, GG.)

On September 14, 2004, the City of Perham delivered a letter to Barlow canceling the O&M.  (Zylstra Aff. Ex. G.)  The City of Perham alleged that Barlow failed "to operate, maintain, and repair the Facility in accordance with the terms of the Agreement" and, further alleged "[d]amages owed by the operator [Barlow] in excess of the cap set forth in the Agreement." (Id.)

**3.      The Counties File Suit**

Due to the loss incurred by the incinerator's failure to generate revenue, the Counties filed suit against Barlow (the underlying Barlow action) alleging claims of: (1) Common Law Fraud (Misrepresentations) [2 Counts]; (2) Common Law Fraud (Omissions); (3) Negligent Misrepresentations; (4) Breach of Fiduciary Duty; (5) Engineering Malpractice and (6) Breach of contract.  (Ex. H.)  These claims were based upon the Counties' assertions that Barlow, in its FS contract with Otter Tail County, and in its negotiations of the O&M and FMA contracts with City of Perham, misrepresented to the Counties the amount of revenue which was going to be generated from the incinerator's steam sales. (Id.)  The Counties also asserted in their Complaint that they were Third-Party beneficiaries of the O&M and FMA contracts between Barlow and the City of Perham and, accordingly, were entitled to damages for Barlow's breach of the same.  This original complaint by the Counties is not at specific issue in this case; however, it does provide a significant background pursuant to the Counties' intent in commencing the action.

More significant, on September 27, 2005, the Counties amended their Complaint. In their Amended Complaint, the Counties emphasized the contractual relationship between themselves, the City of Perham and Barlow. The Amended Complaint in the underlying <u>Barlow</u> action states, in pertinent part:

> 19.    Plaintiff Counties and City of Perham combined their money, property, time and skill in the business operation of the waste burner. The business operation of the waste burner was jointly controlled by these parties and all parties had a stake in the outcome of the project, both in the form of profit and loss. **Plaintiff Counties and City acted and continue to act as joint venturers and/or partners in this project.**
>
> 20.    Plaintiff Counties and City of Perham combined their money, property, time and skill in the business operation of the waste burner.  These parties have had a mutual understanding for the common purpose of operating the burner, **and each has a right to a voice in the direction and control of the means used to carry it out, through participation in the Coordinating Committee and otherwise.  The project is therefore a joint enterprise between plaintiff Counties and City.**

(Zylstra Aff. Ex. ¶ ¶ 19, 20) (emphasis added.)

Additionally, the Counties' Amended Complaint adds a count against Barlow alleging Promissory Estoppel. This count states in pertinent part:

> 68.    Plaintiff Otter Tail County entered into a contractual relationship with Barlow when it hired Barlow to complete the feasibility study.  The City of Perham entered into a contractual relationship with Barlow when the city hired them to do a feasibility study, retrofit and manage the waste burner facility.  Barlow, in the preparation of the feasibility study, engagement in the retrofit and operation of the waste burner reasonable expected Plaintiff Counties Otter Tail, Todd and Wadena to rely on and act upon their representations and expertise.

8

> Otter Tail, Todd and Wadena Counties did, in fact, rely upon Barlow as was intended. In order to prevent injustice, **Barlow should be estopped from denying the existence of a contract between Barlow and all of the Plaintiff Counties.**

(Id. at ¶ 68) (emphasis added.)

## 4.    Barlow's Counterclaim

Following service of the original complaint in the underlying <u>Barlow</u> action, Barlow asserted a Counterclaim against the Counties consisting of claims of:

 (1)    Tortious Interference with Contract:

 (2)    Tortious Interference with Prospective Economic Advantage:

 (3)    Unjust Enrichment, and

 (4)    Civil Conspiracy.

(Ex. I.)

The gravamen of Barlow's counterclaim centered upon Barlow's assertion that the Counties **"intentionally and improperly"** pressured the City of Perham to cancel the O&M and failed to pay additional monies owed under the FMA. (Id.) (emphasis added.)

## 5.    Overview of MCIT

MCIT is a self-funded, risk-sharing, joint powers organization created by Minnesota counties pursuant to Minnesota Statutes § 471.59 and § 471.981 and owned by its members. (Sykes Aff. ¶ 2.) Membership in MCIT is selective, with entities seeking membership required to meet the following criteria:

 (1)    entities seeking membership can do so pursuant to the Trust's membership guidelines

(2)    entities seeking membership must further be subject to the tort immunities and limitations afforded by Minnesota Statute § 466

(3)    entities seeking membership must be sponsored by either a member county or MCIT and, finally

(4)    entities seeking membership must be approved for participation by MCIT's Board of Directors

(Sykes Aff ¶ 3.)

The MCIT provides coverage or services to 82 of Minnesota's 87 counties and over 380 public entities associated with Minnesota county government. Todd, Wadena and Otter Tail Counties are MCIT members. (Sykes Aff. ¶ 5.) The MCIT provides public entities an opportunity to come together to jointly provide coverage for similar risks. Presently, members of MCIT pool their financial resources to provide Liability, Worker's Compensation and Property and Casualty coverage. Members contribute annual dues based upon an actuarial formula involving the member's exposure, the member and the pool's prior loss history, the number of members participating in the Trust and the portion of the expected administrative costs of the Trust. (Sykes Aff. ¶ 6.) Contributions are prospective and represent what MCIT expects will be needed to pay defense costs and claims and provide services for the upcoming year. (Id.)

6.    **MCIT Joint Powers Agreement and Bylaws**

Once membership has been approved by the MCIT Board of Directors (hereinafter the "Board"), the county seeking membership then agrees to and signs the Joint Powers Agreement. (Sykes Aff. ¶ 8; Zylstra Aff. Ex. R.) The Joint Powers Agreement empowers the Board to adopt bylaws for the operation of MCIT. (Zylstra Aff. Ex. HH, p.

2.)   ("The Board shall adopt Bylaws which shall provide for the operation and administration of the Trust.")

The MCIT Bylaws expressly provide:

**Section 2.2 – Trust Membership Not To Be Considered Insurance**

Participation in the Trust shall not constitute the procurement of insurance or operating an insurance business, unless specifically stated by resolution of the Board.

The Board has **sole responsibility** for resolving Member disputes, including but not limited to coverage (decisions to defend or not defend and/or indemnify), membership status, dividends or assessments and Trust dissolution. A Member may, in writing addressed to the MCIT Executive Director, request a hearing regarding a dispute.

(Zylstra Aff. Ex. R p. 11.)

The MCIT Bylaws provide a complete and comprehensive method to resolve member disputes regarding coverage. They state:

1.      Disputes involving an MCIT decision to defend or not defend and/or indemnify the following process shall apply:

a.      The Member shall submit to the Board or their designee a written Notice of Appeal within 21 calendar days of the date of the decision being appealed. The Notice of Appeal shall contain the following:

(1).    Identification of the decision being appealed.

(2).    A statement of the issue(s) for the Board's consideration, including copies of all document, letters and other items relevant to the appeal.

11

(3).    A summary of the position and arguments of the Member.

(4).    The disposition requested by the Member.

(5).    The anticipated length of herein including a list of all witnesses and presenters to be utilized by the Member at the hearing.

b.    Upon receipt of the Notice of Appeal, the Board or the designee shall set a date and time for hearing, and notify the appealing Member of the same.

c.    The hearing of the appeal shall be conducted as follows:

(1).    The Member shall make its presentation to the Board.   The Member may present oral and/or written argument, and may submit whatever documentation it determines appropriate, including proposed Findings of Fact and Conclusions.

(2).    MCIT staff shall then present the argument and documentation in support of the decision being appealed, including proposed findings of Fact and Conclusions.

(3).    The hearing shall be recorded.   The record shall be preserved by MCIT for at least 24 months from the date of the Board's decision concerning the appeal.

(4).   At the conclusions of the presentations, the Board shall deliberate and make a determination.   The Board shall adopt written Findings of Fact and Conclusions in support of its decision.

(5).   All notices of appeal regarding a request of a variance of the Coverage Document shall follow the same procedures set forth above.

A member may request that the Board provide a variance from the terms of the Agreement, Bylaws, and Coverage Document.   Such request shall identify that the member seeks a variance and does not dispute the basis for the decision;   and sets forth the reasons that a variance is necessary.

All decisions of the Board shall be **final and binding** on the Member and the Board, subject to the terms of the Agreement, Bylaws and Coverage Document.

The Member shall be notified of the Board's decision with 90 days of the close of the hearing.

\* \* \*

(Id. pp. 11-12) (emphasis added.)

In exchange for granting final and binding authority to the Board, members have historically received not only affordable coverage and dividends, but extensive risk management training, as well as the additional benefit of much broader coverage than afforded under traditional "insurance policies."   The pooled self-insurance coverage

offered by MCIT is uniquely tailored to membership needs.  For example, insurers typically do not cover:

- Department of Human Rights or Equal Employment Opportunity Claims

- Writs of Mandamus and non-monetary claims

- Pesticide/herbicide applications

- Death of Law Enforcement K-9s

- Open meeting and data practice claims

(Sykes Aff. ¶ 7.)

Further, in contrast to standard insurance providers, MCIT provides extensive loss control education and training to its members, including:

- Regular publications for members addressing coverage, risk, management/loss prevention and claims issues.

- Regional seminars, association presentations and single-member training sessions for members.

- Satellite training sessions transmitted statewide that cover risk management and loss prevention topics.

- Annual coverage reviews with each County member.

(Sykes Aff. ¶ 9).

7. **The Counties' Coverage Claim and the Challenged MCIT Board Determination**

Following service of the Barlow Counterclaim, the Counties tendered the defense of the Counterclaim to the MCIT.

On June 8, 2005, MCIT staff denied coverage pursuant to the Contractual Penalties/Breach of Contract provision contained within the 2005 Coverage Document.[1] (Ex. K.) Specifically, MCIT recognized that, as the entirety of Barlow's Counterclaim centered upon the allegation that the Counties intentionally induced the City of Perham to breach its contract with Barlow, that coverage pursuant to the 2005 Coverage Document was not afforded. Subsequently, on June 16 and 17 2005, the Counties appealed MCIT's decision. (Ex. M, N.) On July 20, 2005, MCIT amended its original denial and indicated that, in addition to the breach of contract exclusion, as the Counterclaim contained allegations of intentional torts, coverage was further excluded due to the 2005 Coverage Document's Exclusions for Fraud, Dishonesty, Malicious and Criminal Acts and Intentional Wrongdoing. (Zylstra Aff. Ex. O.)

Pursuant to Section 7.11 of the MCIT Bylaws, on November 10, 2005, a hearing was conducted by the MCIT Board of Directors concerning the Counties' coverage appeal. (Ex. DD.) Following extensive briefing by the Counties and MCIT Staff, as well as oral arguments, the MCIT Board of Directors issued Findings of Fact and Conclusions denying the Counties' appeal for coverage. (Id.)

## 8.      Settlement of the Underlying Barlow Suit

Despite the MCIT Board's defense/indemnity decision, Barlow and the Counties continued with their suit. During the suit, Barlow initiated a motion to dismiss the Counties' action. (Zylstra Aff. Ex. Z.) In its order, this Court dismissed all of the

---

[1] The parties do not dispute that the 2005 Coverage Document is the applicable MCIT Coverage Document in the present matter.

Counties' causes of action save the fact that the Counties were third-party beneficiaries to the O&M. (Id. at p. 24.) On that issue, this Court stated:

> The Operations and Maintenance Agreement contains sufficient evidence to find the Counties were intended beneficiaries to the contract. Although Perham and Barlow were the only signatories to the Operations and Maintenance Agreement, the contract is replete with references to the "Counties" and evinces a clear intent to benefit Otter Tail County, Todd County and Wadena County.

(Id. at p. 20.)

The case continued and eventually settled. As part of the settlement, Barlow and the Counties entered into a stipulation pursuant to the Minnesota Supreme Court's decision in <u>Miller v. Shugart</u>, 306 N.W.2d 729 (Minn. 1982), entering judgment in favor of Barlow in the amount of $750,000, ($250,000 per county) and dictating that this amount may be recovered only via an action by Barlow against MCIT. (Ex. Q.) Barlow's effort to collect the confirmed judgment directly from MCIT led to this action.

## DOCUMENTS COMPRISING THE RECORD

I.    Affidavit of Joel W. Zylstra with the following exhibits:

A – Consulting Services Agreement between the County of Otter Tail and Defendant/Counterclaimant/Judgment Creditor/Plaintiff on Supplemental Complaint Barlow Projects, Inc.

B – March 23, 2001, Facility Modifications Agreement between the City of Perham and Barlow

C – March 23, 2001, Operations and Maintenance Agreement between the City of Perham and Barlow

D – March 27, 2001 Solid Waste Delivery Contract between the City of Perham and Otter Tail County

E – March 27, 2001, Waste Delivery contract between the City of Perham and Todd County

F – March 27, 2001, Solid Waste Delivery contract between the City of Perham and Wadena County

G – September 14, 2004, letter from the City of Perham to Barlow

H – original Summons and Complaint between the counties of Otter Tail, Todd and Wadena vs. Barlow

I – Answer and Counterclaim of Barlow to the counties of Otter Tail, Todd and Wadena

J – June 8, 2005, letter from John Stein, MCIT, to Steven Rufer, counsel for the counties of Otter Tail, Todd and Wadena

K – selected portions of the 2005 MCIT Coverage Document

L – June 16, 2005, letter to John Stein from David J. Hauser, Otter Tail County Attorney

M – June 16, 2005, letter to John Stein from Gaylord Saetre, Todd County Attorney

N – June 17, 2007, letter from Jonathan Edin, Waseca County Attorney, to John Stein

O – July 20, 2005, letter from John Stein to David J. Hauser

P – Minnesota Court of Appeals unpublished decision of Millavetz Gallop & Millavetz, P.A. v. Hill 1998 W.L. 422229 (Minn. Ct. App.)

Q – Miller v. Shugart Settlement Agreement between the counties of Todd, Wadena, Otter Tail and Barlow

R – November 14, 2004, bylaws of MCIT

S – Deposition of Michael Hanen

T – November 1, 2000, letter from David Hauser, Otter Tail County Attorney, to Trudy Richter

17

U – November 14, 2000, letter from Michael Hanan to the Otter Tail County Commissioners

V – September 25, 2005, Amended Complaint of the Counties of Todd, Wadena and Otter Tail

W – Joint Memorandum of the Counties of Todd, Wadena and Otter Tail in Opposition to Defendant Barlow's Motion to Dismiss

X – December 7, 2005, Deposition of Robert Louiseau, City Manager, City of Perham

Y – January 20, 2004, letter from Sydney Nelson, Otter Tail County Board Chair, to Robert Louiseau, City Manager, City of Perham

Z – May 11, 2005, Order of the Court in regard to Barlow's Motion to Dismiss

AA – June 30, 2003, Memo from Mike Hanan to the Otter Tail County Commissioners

BB – January 14 – 15, 2003 email exchange between George Minerich, Stearns County, Minnesota, and Michael Hanan, Solid Waste Director of Otter Tail County

CC – October 30, 2003, letter from Michael Hanan to Otter Tail County Commissioners

DD – November 10, 2005, Findings of Fact and Conclusions of the MCIT Board of Directors

EE – February 25, 2004, Memorandum of Robert Louiseau, City Manager to the City of Perham City Council Members

FF – January 23, 2004, letter from the Wadena County Board of Commissioners to the City of Perham

GG – December 2, 2003, Resolution of Todd County

HH – MCIT Joint Powers Agreement

II.    Affidavit of Robyn Sykes

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there are no issues of material fact in dispute and the moving party is entitled to judgment as a matter of law Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis of its motion, identifying those portions of the record which it believes demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S.317, 325, 106 S. Ct. 2548, 91 L. Ed. 265 (1986).

Once the movant carries this burden, the moving party must then show that summary judgment should not be granted. Celotex, 477 U.S. at 324-25. A mere scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "There must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L. Ed. 2d, 202 (1986). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather an integral part of the Federal Rules as a whole, which are designed to 'secure just, speedy and inexpensive determination of every action." Fed R. Civ. P. 1, Celotex, 447 U.S. at 324. (1984).

## ARGUMENT

**I.   JUDICIAL REVIEW OF THE CHALLENGED MCIT BOARD'S DECISION HAS BEEN WAIVED BECAUSE ARTICLE 7.11 OF THE MCIT BYLAWS INDICATES SUCH A DETERMINATION IS "FINAL AND BINDING" ON MCIT MEMBERS.**

Prior to 2003, MCIT had no specific alternative dispute resolution process in its Joint Powers Agreement, Bylaws or Coverage Document that specified how a decision

by MCIT to <u>not</u> provide a member with pooled funds for defense/indemnity could be challenged. The absence of such language led to a dispute between a consortium of counties and MCIT concerning such an issue. In <u>County of Martin, et al. v. MCIT</u>, 658 N.W.2d 598 (Minn. App. 2003), the consortium brought suit in district court. The Minnesota Court of Appeals, considering the narrow issue of subject-matter jurisdiction, concluded that review of a coverage determination was to be in district court rather than the court of appeals. The court of appeal stated:

> We conclude MCIT resembles an insurance company <u>for purposes of this jurisdictional question</u>.

Id. at 603 (emphasis added).

What <u>County of Martin</u> did not address is the scope of review to be applied by a court in reviewing such an MCIT Board decision. This is because the <u>County of Martin</u> case settled.

Subsequent to the <u>County of Martin</u> decision, the MCIT Bylaws were expressly modified by the MCIT Board in February, 2004, to create a detailed quasi-judicial/alternative dispute resolution process for the making of "coverage" decisions, i.e. decisions involving the disbursement and use of pooled resources. The process, now contained at Section 7.11 of the Bylaws, involves a written notice of appeal, the submission of briefs, the examination of witnesses, oral argument, and a formal hearing. The hearing is recorded. At the conclusion of the hearing, the MCIT Board engages in deliberation, and ultimately adopts written Findings of Fact and Conclusions. Most importantly, the post-<u>County of Martin</u> 2004 Bylaw change indicates:

> ...all decisions of the Board shall be **final and binding**
> on the Member and the Board, subject to the terms of
> the Agreement, Bylaws and Coverage Document.

Id. (emphasis added).

Given the Miller-Shugart Settlement Agreement in the underlying <u>Barlow</u> suit, Barlow has stepped into the shoes of the assignor Counties. It has no greater rights, and is subject to all pertinent limitations contained in the MCIT Bylaws, including Article 7.11. A decision that is final and binding on the Counties is also final and binding on Barlow.

Plaintiff will likely argue that the terms of the Coverage Document still permit a primary challenge to a substantive "coverage" decision in district court, notwithstanding the new ADR process in Section 7.11 of the Bylaws and the addition of the "final and binding" language therein in 2004. But such a position lacks merit when the MCIT Bylaws and Coverage Document are read together.

State and federal courts have consistently indicated that the judicial branch must, in all cases, have some residual ability to review ADR decisions. In the context of arbitration, the Uniform Arbitration Act, Minn. Stat. Ch. 572, vests courts with jurisdiction to overturn arbitration decisions in certain circumstances. In a second context, the State Court created a "contrary to public policy" exception to ADR decisions that are otherwise "final and binding." In a third context, courts have indicated that the judicial branch must retain a residual ability to review ADR decisions to assure that constitutional error does not occur in a given decision. <u>See, e.g.</u>, <u>McGrath v. State</u> 312 N.W.2d 438, 442 (Minn. 1981); <u>Johnson v. Robison</u> 415 U.S. 361, 366 (1974).

21

With the above backdrop, the "final and binding" provision in Section 7.11 of the MCIT Bylaws can be read in a way that it is consistent with the more general provision in Section V (D)(2) of the Coverage Document that pertains to lawsuits against MCIT. Section 7.11 of the Bylaws, and the "final and binding" limitation applies, by its terms, to the substantive decision of the MCIT Board. Section V (D)(2) of the Coverage Document would be the mechanism dictating Ramsey County District Court review involving any residual authority the court may have to review the Board's decision for constitutional, public policy, fraud or other issues within the scope of the court's residual power.

As an example of the above, any argument that the Section 7.11 ADR process violates procedural due process protections in the state and/or federal constitution would need to be made in a Ramsey County district court action initiated within two years of the alleged loss or damage. Any argument that the MCIT Board committed fraud, in contravention of public policy, would have to be made in Ramsey County district court subject to the same time constraints. However, substantively, the actual determination itself not to allocate funds to Todd, Wadena and Otter Tail Counties in this dispute is subject to the "final and binding" language in Section 7.11 of the Bylaws.

In summary, and for the above reasons, this action is improper. The Counties' substantive challenge to the MCIT Board's decision to <u>not</u> provide defense/indemnity in the underlying <u>Barlow</u> action should be dismissed as counter to Section 7.11 of the MCIT Bylaws.

22

II.   **EVEN IF THE COURT DETERMINES JUDICIAL REVIEW OF THE CHALLENGED MCIT BOARD DETERMINATION IS PROPER, SUCH REVIEW MUST BE CONDUCTED UTILIZING STANDARDS IN MINNESOTA LAW GOVERNING CHALLENGES TO DECISIONS OF ADMINISTRATIVE BODIES.**

A.   **The Minnesota Counties Insurance Trust is an Entity to Which Deferential Review Standards Apply.**

Minn. Stat. § 471.59 authorizes government entities to enter into agreements and create entities that exercise governmental powers common to contracting parties. The statute, known as the Joint Powers Act, provides in pertinent part:

> Two or more governmental units, by agreement entered into through action of their governing bodies, may jointly or cooperatively exercise any power common to the contracting parties...The term "governmental units" as used in this section includes any city, county, town, school districts, other political subdivision of this or another state, another state, the University of Minnesota, and any agency of the State of Minnesota or the United States...

Minn. Stat. § 471.59, subd. 1.

Minn. Stat. § 471.981 authorizes counties to self-insure against damage or economic loss. Subdivision three of § 471.981 authorizes political subdivisions of the State to pool economic resources. Subdivision three authorizes political subdivisions to create a joint board to manage their pooled funds, and make economic allocation decisions on behalf of the constituent members.

MCIT is a joint powers entity created specifically by constituent member counties, including Todd, Wadena and Otter Tail Counties, to manage pooled self-insurance funds. See JPA preamble clauses (referencing Minn. Stat. §§ 471.59 and 471.981); Id., Article II (declaring MCIT is a joint powers entity). The MCIT Board was created to make

23

economic allocation decisions on behalf of constituent members. The MCIT Board was empowered by the signatory counties to spend their combined funds in a manner consistent with the Coverage Document.

Article IV of the JPA provides that the MCIT Board shall have the power to "oversee and administer the Trust." The power to manage governmental funds was specifically delegated to MCIT by action of the county boards of each County involved in the underlying Barlow suit. The county boards of these Counties each adopted a resolution authorizing MCIT to act on their behalves, and exercise the powers of that county to self-insure.

Minnesota law has, to date, not precisely defined the nature of a joint powers entity created under Minn. Stat. § 471.59. In In re Greater Morrison Sanitary Landfill, 435 N.W.2d 92 (Minn. App. 1989), 43 local governments utilized the joint powers statute to create the Greater Morrison County Sanitary Landfill Board to operate a landfill. The Board, like MCIT, was made up of representatives of member government units. The Board, like the MCIT Board, was vested with the obligation to operate the joint landfill on behalf of parties to the joint powers agreement.

Ultimately, the Minnesota Pollution Control Agency issued a closure order. As part of the process, the MPCA identified potential responsible parties under MERLA and CERCLA for purposes of effective closure of the landfill. This list included cities and townships that had withdrawn from the joint powers entity prior to the closure order. These cities and towns challenged the MCPA's determination, arguing that a joint powers

24

entity is a separate legal entity in the nature of a corporation or partnership. As such, they argued, they were not individually responsible for closure of the landfill.

Addressing the question of the nature of a joint powers entity under Minnesota law, the Minnesota Court of Appeals indicated:

> It is not clear whether a separate legal entity is created when governmental units act pursuant to the Joint Exercise of Powers Act, Minn. Stat. § 471.59. Neither is it clear whether that entity has the attributes of a corporation or partnership or is simply an agent acting on behalf of the principal member government units.

> We believe that the entity, if any, created - - is in the nature of a hybrid, potentially possessing attributes of all the aforementioned legal relationships. The precise nature of any such entity, however, must be determined on a case by case basis upon a thorough analysis of the purpose for and responsibilities of the entity.

Id. at 96. (citations omitted).

The Court in Greater Morrison Sanitary Landfill never made the case-by-case determination because it resolved the legal issues on other grounds.

In a recent case considered by this Court, the Court had the occasion to apply the Greater Morrison Sanitary Landfill test in the context of a dispute involving a Minn. Stat. § 474.59 joint powers entity and the City of Geneseo in Illinois. Ultimately, this Court applied municipal law principles of apparent authority (or the lack thereof) in the municipal context to conclude officers of the joint powers entity had no ability to bind the joint powers board to certain contracts. Stated another way, the subject contracts required joint board approval.

In <u>City of Geneseo</u>, 2007 WL 1027294 (D. Minn. 2007) as was the case in <u>Greater Morrison Sanitary Landfill</u>, and as is the case with MCIT, a group of municipalities joined together under Minn. Stat. § 471.59 to create an entity that would exercise, on behalf of the municipalities, a power that each of the municipalities could exercise by themselves. In <u>Greater Morrison Sanitary Landfill</u>, the municipalities created an entity to manage solid waste – a power common to each contracting party. In <u>City of Geneseo</u>, the municipalities created an entity to plan, engineer, schedule, service and sell energy to themselves and other municipalities – a power common to each contracting party. In MCIT's case, the contracting parties to MCIT created an entity to manage risk and protect members from municipal liability in light of the abrogation of sovereign immunity – again, a power common to each contracting county.

In <u>City of Geneseo</u>, the joint powers entity (called "UP") purportedly entered into an agreement for the purchase of utility capacity. The problem, however, involved the fact that the City of Geneseo had, through its governing board, taken action approving the agreement, but the UP Board had not. Instead, UP's president (rather than the full UP Board) had purportedly "acquiesced" in the agreement. Ultimately, suit was filed by the City of Geneseo in Federal Court, and one of the key issues was the legal validity and binding effect of the purported agreement between the City and UP's President. Specifically, the City argued that the UP President had either actual and/or apparent authority sufficient to bind UP to the purported agreement.

In its analysis of the above issue, this Court began with an analysis of UP itself. Recognizing the Minnesota State Court's holding in <u>Greater Morrison Sanitary Landfill</u>,

this Court engaged in an analysis of the nature of UP as it related to the specific claims of the City. In rejecting the City's arguments, the Court applied principles involving apparent authority and equitable estoppel in the governmental/municipal context.

As stated, MCIT, like UP, was formed by a collection of Minnesota municipalities to perform a function and power common to each entity. MCIT is a municipal self-insurance pool. MCIT members have chosen not to procure commercial insurance. Instead, they, in fundamental terms, throw their money into a kitty and pay out claims as they are asserted against members. MCIT, as individual county members could, engages in risk management activities in an effort to lower the demand on the pooled public funds. MCIT has a board composed entirely of county officials. The Board has promulgated By-laws and a Coverage Document spelling out the rules involving the disbursement and use of pooled public funds. Each member has empowered the MCIT Board to make economic decisions involving the expenditure of its pooled funds, and has bound itself to abide by the rules established by the MCIT Board.

Given the characteristics of MCIT, it, like UP in the City of Geneseo case, should be characterized as an entity that has taken on the attributes of its constituent members, at least as it relates to the issue in this case. Decisions involving the use of public money are basic and quintessential decisions of government. One of the very fundamental purposes of MCIT is to make economic allocation decisions on behalf of members. Member counties have expressly authorized MCIT to determine when pooled funds should be used, and when they should not. Every time the MCIT Board determines to pay a significant amount of money to a claimant, it is using the public funds of MCIT

members.  Consequently, this Court should conclude that, for purposes of the issue in this case, MCIT has taken on the attributes of its members, and the challenged economic allocation decision should be reviewed as if the members had made the decision themselves.

**B.      Pertinent Standards in Minnesota Law Require the Court to Defer to the Challenged MCIT Board Decision.**

Given the fact MCIT shares the attributes of its member counties for purposes of the challenged decision to <u>not</u> allocate funds to the Counties in conjunction with the underlying <u>Barlow</u> suit, it follows that the standard of review pertinent to challenges of like decisions of municipal members of MCIT should apply to MCIT's decisions itself. In this regard, the challenged coverage or economic allocation determination by the MCIT Board is entitled to deference under Minnesota Law.  The determination should not be overturned absent demonstration by Barlow that is was arbitrary and capricious or unsupported by substantial evidence.

Minnesota law contains a wealth of case law involving judicial review of administrative/governmental decisions.  The case law has developed in light of the separation of powers principles that are very much pertinent to review by one branch of government of the decisions of another branch.

Government is divided into three distinct departments:  legislative, executive and judicial.  The powers of government are divided among these branches of government. No member of one branch is allowed the powers of any other branch "except in the instances expressly provided" in the Minnesota Constitution.  Minn. Const. Art. III, § 1.

The separation of powers doctrine "has roots deep in the history of Anglo American political philosophy." <u>Wulff v. Tax Court of Appeals</u>, 288 N.W.2d 221, 222 (Minn. 1979). In <u>Wulff,</u> the Supreme Court acknowledge that:

> [W]hile...the actual workings of such a balanced government has been altered through the years, the basic principle remains; too much power in the hands of one governmental branch invites corruption and tyranny.

<u>Id.</u> at 223.

In recognition of the separation of powers set forth in the Constitution, courts, since the late nineteenth century, have consistently concluded that judicial review of administrative decisions should be conducted in a way and through standards that recognize separation of power principles.   See, <u>e.g.,</u> <u>State ex rel. Hart v. Common Council of City of Duluth,</u> 53 Minn. 128 (1893); <u>State ex rel. Fulong v. McCold,</u> 127 Minn. 155, 149 N.W. 11 (1914); <u>Beck v. Council of the City of St. Paul,</u> 235 Minn. 56, 50 N.W.2d 81 (1951).

Limiting the <u>scope</u> of judicial review of agency/governmental decisions has been determined to be consistent with separation of powers principles because it limits the breadth and nature of judicial review, while still maintaining the judicial branch's general power to review the actions of the other two branches of government.  Limited judicial review of such decisions assures that the administrative prerogatives of agencies are not usurped by the courts.

The first principle pertinent to this Court's review of the challenged MCIT Board decision is that an agency/governmental decision is entitled to a presumption of

correctness. Stated another way, a court must defer to an agency's decision and not substitute its judgment for that of the agency, even where the court would have reached a different result. See, e.g., Anderson v. State Department of Natural Resources, 674 N.W.2d 209 (Minn. App. 2005), Taylor v. City of Newlander 536 N.W.2d 901 (Minn. App. 1995).

Courts have indicated that they will intervene in review of agency/governmental decisions in two other contexts. First, courts will intervene where the evidence demonstrates that an agency has not taken a "hard look" at the challenged decision. Reserve Mining Co. v. Harbor, 256 N.W.2d 808, 825 (Minn. 1977). Second, courts will intervene where the evidence demonstrates that the challenged decision constitutes the exercise of the agency's will rather than its judgment. In Re Detailing Criteria and Standards for Measuring Utilities Good Faith Efforts in Meeting Removable Energy Objectives, 700 N.W.2d 533 (Minn. App. 2005).

In determining whether a challenged agency/governmental decision was arbitrary and capricious, the review is narrow. Manufactured Home Dealer License MD 1518 Issued to Toberman, 527 N.W. 2d 138 (Minn. App. 1995). If the facts demonstrate there is room for two opinions on the matter, a decision is not arbitrary and capricious. Matter of Resolution of City of Austin, 567 N.W.2d 529 (Minn. 1997).

In summary, this case involves a challenge to an agency/governmental decision: the November 10, 2005, decision of the MCIT Board not to spend pooled municipal funds to provide defense/indemnity to Todd, Wadena and Otter Tail Counties in the underlying Barlow suit due to the Counties' conscious business decision to force the City

of Perham to cancel its contract with Barlow. The decision was quasi-judicial in nature because the MCIT Board applied facts to pre-existing standards and reached a conclusion. The MCIT Board made the decision on behalf of all members of MCIT, and the decision should be reviewed by this Court in light of the above-described standards that apply generally to review of agency/municipal decisions.

III.   **PURSUANT TO THE TERMS OF ITS COVERAGE DOCUMENT, MCIT DID NOT OWE THE COUNTIES DEFENSE OR INDEMNIFICATION IN THE UNDERLYING BARLOW ACTION, AND THE CHALLENGED MCIT BOARD DECISION WAS NOT ARBITRARY AND CAPRICIOUS.**

This matter centers upon the Counterclaim asserted by Barlow against the Counties in response to the Counties' original suit. In that Counterclaim Barlow alleges that the Counties *intentionally and improperly* interfered in its contract with the City of Perham. As Barlow's Counterclaim arises out of breach of contract, and, further, alleges intentional acts by the Counties, all of Barlow's claims are clearly outside of the scope of coverage provided by the MCIT Coverage Document, relieving MCIT of any duty to defend or indemnify its member Counties for said claims. Accordingly, the November 10, 2005, decision of the MCIT Board of Directors was neither arbitrary nor capricious and must be upheld.

A.   **All Counts of Barlow's Counterclaim Arise out of a Breach of Contract or Other Obligation and, Therefore, are Excluded from Coverage.**

While the facts of the original underlying action between the Counties, the City of Perham and Barlow are somewhat complex, the facts relating to Barlow's Counterclaim and its basis in breach of contract are relatively simple:

- The Counties entered into a contract with the City Perham.

31

- The Counties were third-party beneficiaries to the contract between the City of Perham and Barlow. (Zylstra Aff. Ex. Z p. 20.)

- The Counties made the **conscious business decision** to demand that the City of Perham terminate its contracts between itself and Barlow. (Zylstra Aff. Ex. Y, EE, FF, GG.)

- The Counties made the **conscious decision** to initiate suit against Barlow for its alleged breach of contract.

- The MCIT Coverage Document excludes from coverage all actions arising out of breach of contract.

Based upon these simple facts, the MCIT had no duty to defend or indemnify the Counties and, therefore, Barlow's claim must fail.

**1.   Barlow's Counterclaim arises out of breach of contract.**

It is elementary that the underlying Barlow claim arises out of breach of contract. First, in their original Complaint, the Counties alleged misrepresentation, breach of fiduciary duty and **breach of contract**, all arising out of the contract with Barlow, or more accurately, the "contractual relationship with Barlow when it hired Barlow to complete the feasibility study." (Zylstra Aff. Ex. H ¶ 67.) The Counties further asserted in their Complaint in the underlying <u>Barlow</u> action that "[t]he other Plaintiff Counties are Third-Party beneficiaries of the contract between Barlow and Otter Tail County." (Id.)

Also in their Complaint, the Counties state that they are not only a beneficiary of the contract between Otter Tail County and Barlow but, also, "that they are third-party beneficiaries to the contract between Barlow and the City of Perham." (Id. at ¶ 63.) The Counties also assert that "[d]efendant Barlow knew, or should have known of, the misrepresentations and *breaches of the contract* between Barlow and the City of Perham

32

would directly result in damage to the plaintiff counties" and that this breach caused damage to the counties." (Id.) (emphasis added)

Moreover, in their subsequent Amended Complaint, the Counties again claimed, using even stronger language, that they were beneficiaries of the City of Perham's Contracts with Barlow. (Zylstra Aff. Ex. V.) They claimed:

> 68.   Plaintiff Otter Tail County entered into a contractual relationship with Barlow when it hired Barlow to complete the feasibility study.   The City of Perham entered into a contractual relationship with Barlow when the city hired them to do a feasibility study, retrofit and manage the waste burner facility.   Barlow, in the preparation of the feasibility study, engagement in the retrofit and operation of the waste burner reasonable expected Plaintiff Counties Otter Tail, Todd and Wadena to rely on and act upon their representations and expertise.

> Otter Tail, Todd and Wadena Counties did, in fact, rely upon Barlow as was intended.   In order to prevent injustice, **Barlow should be estopped from denying the existence of a contract between Barlow and all of the Plaintiff Counties.**

(Zylstra Aff. Ex. O ¶ 68.)

Accordingly, as the Counties themselves have asserted that their claims originate out of a breach of the contracts between Barlow and the City of Perham and Barlow and Otter Tail County, it follows that Barlow's Counterclaim originates from the same breach of the same contracts. (Zylstra Aff. Ex. H at ¶¶ 62, 63)  The Counties themselves assert that this matter arises out of the alleged breach of the contract between the City of Perham and Barlow. (Id.)  While the Counties are not signatories to that contract, in both their original and amended Complaints, they attempt to avail themselves of that contract

and garner damages as the result of that contract's breach. (Zylstra Aff. Ex. H; O). Indeed, the County officials believed that the Contracts in place between the Counties and the City of Perham provided them with the authorization to force the City of Perham to cancel the Operation and Maintenance Agreement. (Zylstra Aff. Ex.Y)   If the Counties are availed themselves of contractual benefits in order to garner damages, it is only logical that Barlow, standing in the stead of the Counties should not be able to turn on the argument they originally asserted to allege that the breach of contract exclusion contained within the MCIT Coverage Document does not apply because of a lack of contract between Barlow and the Counties. Indeed, this matter's foundation based upon the contractual relationship between Barlow and the Counties has been addressed and ruled upon by this Court. In its order the Court states:

> The Operations and Maintenance Agreement contains
> sufficient evidence to find the Counties were intended
> beneficiaries to the contract. Although Perham and Barlow
> were the only signatories to the Operations and Maintenance
> Agreement, the contract is replete with references to the
> "Counties" and evinces a clear intent to benefit Otter Tail
> County, Todd County and Wadena County.

(Zylstra Aff. Ex. Z, pp. 20).

Indeed, based upon the court's ruling above, the well-settled doctrine of collateral estoppel clearly settles the issue of the Counties rights in the contract between the City of Perham and Barlow. Collateral estoppel prevents a party from re-litigating an issue if (1) the issue is identical to one in a prior adjudication; (2) there was a final judgment on the merits of the issue; (3) the estopped party was a party in the prior case; and (4) there was full and fair opportunity to be heard on the issue. In re: Trust Created by Lois W. Hill on

<u>December 31, 1917, for the Benefits of Maud Hill Schroll</u>, 499 N.W.2d 475, 485 (Minn. Ct. App. 1993) *rev. denied* (Minn. July 15, 1993) <u>see also</u> In re: Welfare of M.D.O., 462 N.W.2d 370, 375 (Minn. 1990).

Here, Barlow, in its pleadings supporting its previous motion to dismiss has had a full and fair opportunity to be heard on the issue of the Counties rights under the contracts between the City of Perham and Barlow. This issue was fully briefed and litigated by both parties and this Court has ruled that the Counties were third-party beneficiaries of the Contract between the City of Perham and the Counties and Barlow should be estopped from asserting otherwise.

Moreover, just as the Counties underlying action was based upon breach of contract, Barlow's counterclaim was based upon breach of contract was well. Count I of Barlow's counterclaim alleges that "[e]ach of the Counties intentionally and improperly procured *the breach of said contract* by engaging in wrongful conduct." (Ex. I ¶ 32) (emphasis added). Count II of Barlow's counterclaim alleges that the Counties "intentionally and improperly interfered with these *prospective contractual relations* with the City by inducing the City not to continue with its hiring of Barlow as operator of the QRR Facility." (Ex. I ¶37) (emphasis added). Count IV of Barlow's Counterclaim alleges that the Counties "actively and/or tacitly conspired with each other and with the City to deprive Barlow of its rights *under its agreements with the City*..." (Ex. I)(emphasis added). Count III of Barlow's Counterclaim is for unjust enrichment which is based directly on the actions of the Counties in securing the breach of the between the City of Perham and Barlow. (Ex. I ¶40).

The undisputed facts in the present matter clearly demonstrate that the MCIT Board of Directors were neither arbitrary nor capricious in their finding that both the Counties' original action and Barlow's counterclaim arise out of breach of contract.

2. **The MCIT Coverage Document expressly excludes actions arising out of breach of contract or other obligation.**

The language of the MCIT Coverage Document is clear and excludes all counts of Barlow's Counterclaim as they arise out of or are based upon breach of contract or other obligation. The 2005 Coverage Document expressly excludes:

> Any "Claim" based upon **breach of contract** or other obligation, including an obligation arising out of a written agreement on behalf of a "Member" to another person or entity. This clause specifically excludes any coverage for "damages" or "Claim Expenses" based upon, caused by, or arising from breach of contract, cost estimate overruns on any contract or project or any penalties for failure to comply with a contractual obligation or other duties assumed as a result of a written agreement.

(Zylstra Aff. Ex. L pp. Liability Section IV, General Exclusion (C)).

The breach of contract exclusion contained within the MCIT Coverage Document specifically and unambiguously excludes coverage for any "'Claim" arising out of breach of contract or other obligation." (Zylstra Aff. Ex. L, Liability Section IV, General Exclusion (C)). The MCIT Coverage Document clearly indicates that MCIT does not provide coverage for private contracts between counties and contractors paid to provide them services. This is sound public policy. It is the purpose of risk management tools such as the MCIT Coverage Document to mitigate the potential risk to one county by accidental, unforeseen and fortuitous events. This incident, however, was neither

unforeseen nor fortuitous, rather; it is a suit and counterclaim based upon contracts to which the Counties were beneficiaries and, to which Barlow claims that Counties intentionally interfered.    These were complex contractual agreements between sophisticated parties benefiting from the representation of counsel. (Zylstra Aff. Ex. T). The Counties believed that they would benefit by gaining a reduced price for the sale of their solid waste and, Barlow believed it would benefit by the retrofit and continued maintenance of the incinerator facility.   However, as stated above, after the contracts were executed, the Counties, became dissatisfied with the amount of risk they had undertaken and made the conscious business decision to attempt to force Barlow to renegotiate the contracts or, in the alternative, to force the City of Perham, to terminate the Operations and Maintenance Agreement.   (Zylstra Aff. Ex. Y, BB, CC).   The Counties eventually made the final decision to force the City of Perham to terminate its contract with Barlow. (Ex. Y, EE, FF, GG).   They did so with full knowledge and the advice of counsel. (Ex. CC). The Counties then made the **conscious business decision** to initiate suit against Barlow based upon what they perceived as Barlow's breach of contract.   Indeed, using Otter Tail County as an example, on October 30, 2003, Michael Hanen, Otter Tail County Solid Waste Director, carbon copying the Otter Tail County Attorney, presented the Otter Tail County Commissioners with three potential options:

> (1)     Status Quo – we leave the existing contracts as they are, we continue to operate on a year to year basis, and we continue to infuse cash when operating losses dictate…
>
> (2)     Renegotiate Contracts – we renegotiate based upon the weaknesses of the existing contracts * * *.  We must

strengthen the counties position in relation to operations which includes termination or renegotiation of the current operating contract.

(3)     Closure – terminate all existing contracts, get what we can in salvage value of the facility, restructure the debt, begin to pay off the debt and move forward. **In addition, I believe we should consider legal action against the   City of Perham's Contract Operator.**

(Zylstra Aff. Ex. CC) (emphasis added).

As public entities, the Counties made the **conscious decision** on how to allocate the funds of their constituency. They decided to  enter into contracts, they decided to exert pressure upon the City of Perham to cancel its contract with Barlow and they decided to initiate suit against Barlow for breach of contract.

Risk management tools such as the MCIT Coverage Document are not designed to cover actions involving breach of contract based upon the conscious business decisions of their members.  To hold otherwise would serve to force the MCIT to provide coverage for every business decision made by its member counties which goes awry and end in suit.  This type of coverage was not only not intended by MCIT and its members, it was specifically excluded.  Barlow, now standing in the shoes of the Counties, should not now be allowed a sum of money based upon the indemnity of a Counterclaim of a suit which the Counties themselves initiated, and which centers upon breach of contract.

The four-corners of Barlow's Counterclaim as well as the extrinsic evidence present clearly demonstrates that all the asserted claims arise out of breach of contract. Accordingly, examining this matter with the appropriate deference applied to the MCIT Board's coverage determination, it is evident that the MCIT's decision was not arbitrary

and capricious and, further, utilizing any standard of review, that none of the counts asserted by Barlow are arguably within coverage.

**B.    The MCIT Board also Correctly Concluded that Counts I, II, III and IV of Barlow's Counterclaim are Excluded from Coverage as they Allege Intentional Acts.**

Finally, MCIT did not breach its duty to defend or indemnify the Counties because Counts I, II, III and IV of Barlow's Counterclaim are also excluded from coverage due to the MCIT Coverage Document's Intentional Acts Exclusion.   The Public Officials Liability Section of the Coverage Document, Section III, subsection (i) excludes:

> Any "Claim" arising out of a wrongful act committed intentionally with knowledge of wrongdoing.

> A "Wrongful Act" is defined in the Coverage Document as:

> [A]ny actual or alleged error or misstatement of act of omission or neglect or breach of duty including misfeasance, malfeasance, or nonfeasance . . . by the "Covered" Party in their official capacity.

(Liability Section VI. Definitions.)

In the present matter, all of the claims asserted within Barlow's Counterclaim alleged intentional wrongful acts, also excluding them from coverage pursuant to the express language of the MCIT Coverage Document.

First, Count I of Barlow's Counterclaim alleged tortious interference with contract.  In Minnesota, it is well-settled that this cause of action requires an intentional act.  The elements of tortious interference with contract are: (1) the existence of a contract: (2) the alleged tortfeasor's knowledge of the contract; (3) the *intentional* interference with contract; (3) without justification and (5) damages resulting from the

39

interference. <u>Oak Park Development Co., Inc. v. Snyder Brothers of Minnesota, Inc.</u>, 449 N.W.2d 500, 505 (Minn. Ct. App. 1993) *citing* <u>Guerdon Indus v. Rose</u>, 399 N.W.2d 186, 187 (Minn. Ct. App. 1987) (emphasis added).

Further buttressing the fact that Count I of Barlow's Counterclaim requires an intentional act is the language contained within the "four-corners" of the Count itself. Specifically, the Count alleges "[e]ach of the Counties *intentionally* and *improperly* procured the breach of said contract by engaging in wrongful conduct, as alleged herein." (Ex. I ¶ 32.)  This is significant because Barlow did not allege that the conduct by the Counties was delinquent, negligent or indifferent; rather, Barlow claimed that the Counties "*intentionally* procured the breach of contract." (Id.) (emphasis added.)  Again, this was a **conscious business decision** of the Counties.  Indeed, the term "procure" by its very definition implies intentional conduct.  "Procure" is defined as "to get by special effort; obtain or acquire."  *The American Heritage Dictionary* 1399 (4th ed. 2000). Therefore, Barlow's Counterclaim complained that the Counties, through their intentional acts, improperly obtained the breach of the contract between itself and the City of Perham.  Accordingly, based upon Minnesota law, as well as the express language of the Counterclaim and the MCIT Coverage Document, the MCIT properly concluded that Count I of the Counterclaim is excluded from coverage.

Additionally, Count II of Barlow's Counterclaim is excluded from coverage. Count II of the Counterclaim alleged tortious interference with prospective economic advantage.  Like tortious interference with contract, it is well-settled Minnesota law that the cause of action of tortious interference with prospective economic advantage requires

an intentional act.   See United Wild Rice, Inc. v. Nelson, 313 N.W.2d 628, 632-33 (Minn. 1982) *quoting* Restatement (Second) of Torts §766B (1979) see also Oak Park Development, Inc., 499 N.W.2d at 505.

Like the allegations of Count I of the Counterclaim in the underlying Barlow action, Count II of the Counterclaim also specifically alleges that the Counties "*intentionally* and *improperly* interfered with prospective contractual relations with the City by *inducing* the City not to continue with its hiring of Barlow as the operator of the QRR Facility." (Ex. I ¶ 37) (emphasis added).   Again, as in Count I, Barlow made no allegation that the Counties, through happenstance, caused the City of Perham to breach its contract but, rather, that the Counties induced the City of Perham to discontinue its contract with Barlow.   As with the term "procure," the term "induce" by its very definition requires intentional conduct.   "Induce" is defined as "to lead or move, as to a course of action, by *influence* or *persuasion*."   *The American Heritage Dictionary* 895 (4th ed. 2000).   So, again, Barlow alleged in the Counterclaim that the Counties actively persuaded the City of Perham to breach its contract.   This is an intentional act, and accordingly, excluded from coverage due to the express language of the Coverage Document.

Additionally, the aforementioned Intentional Acts Exclusion contained within the MCIT Coverage Document further excludes the Civil Conspiracy allegation contained within Count IV of Barlow's Counterclaim.   This count alleged:

> Through their above-described actions and omissions, the Counties have actively and/or tacitly conspired with each other and with the City to deprive Barlow of its rights under

41

its agreements with the City and Barlow's relationship with
its employees.

(Ex. I.)

By definition, "conspiracy" is "a combination of persons to accomplish an unlawful purpose or a lawful purpose by unlawful means." Lipka v. Minnesota Sch. Employee Ass'n, 537 N.W.2d 624, 632 (Minn. Ct. App. 1995) aff'd 550 N.W.2d 618 (Minn. 1996). Further, civil conspiracy cannot stand alone but must be based upon a criminal act of an *intentional* tort. Senart v. Mobay Chem. Corp., 597 F. Supp.; 502, 505 (D. Minn. 1984) (emphasis added) see also Milavetz Gallop & Milavetz P.A. v. Hill, 1998 WL 422229 at *4 (Minn Ct. App.).

Accordingly, applying the facts of the present matter to the law as stated above, it is clear that Barlow's Counterclaim of civil conspiracy is rooted within the other intentional torts alleged in the Counterclaim, i.e. tortious interference with contract and tortious interference with prospective advantage. The MCIT Coverage Document specifically excludes coverage for this claim.

Finally, the four-corners of the Counterclaim and the extrinsic evidence, as discussed herein, also demonstrates that Count III of Barlow's counterclaim is based upon intentional conduct. Consequently, the MCIT Coverage Document does not provide either defense or indemnity of this claim as well.

Generally, a claim for unjust enrichment may be based upon intentional or unintentional acts, such as fraud or mistake. "Stated another way, unjust enrichment may be found where a defendant's conduct 'has been unconscionable by reason of a bad

motive, or where the result induced by his conduct will be unconscionable either in the benefit to himself or the injury to others.'" Park-Lake Car Wash, Inc. v. Springer, 394 N.W.2d 505, 513 (Minn. Ct. App. 1986) *quoting* Earle R. Hanson & Associates v. Farmers Cooperative Creamery Co., 403 F.2d 65, 70 (8th Cir. 1968).   In the present matter, Barlow's Counterclaim alleged:

> As a result of defendants' *above referenced actions* and omissions, the Counties have been unjustly enriched, and Barlow has been unjustly injured, in an amount to be determined at trial.

(Ex. I ¶ 40) (emphasis added.)

As state above, all of the actions alleged in Barlow's Counterclaim in the underlying Barlow suit require intent by the Counties.   There is nothing contained within the four-corners of the Counterclaim, nor is their any extrinsic evidence which indicates that Barlow's allegation of unjust enrichment is based in negligence; rather, in all of its other allegations, Barlow claimed that the Counties intentionally induced and/or procured the City of Perham to breach the O&M.   It is through this intentional conduct and the resulting alleged contractual breach that Barlow claimed that the Counties were unjustly enriched.   Accordingly, because Barlow's allegation of unjust enrichment was based upon an intentional act, MCIT had neither a duty to neither defend nor indemnify the Counties on this claim.

In sum, in Counts I, II, III and IV of its Counterclaim, Barlow does not allege any negligent or careless conduct on the part of the Counties; rather, in the Counterclaim Barlow alleges specific "*intentional* and *improper*" interference by the Counties of the

contract between Barlow and the City of Perham. (Ex. I at ¶ 33, 37). While the Counties may argue otherwise, all of the extrinsic evidence present indicates that the Counties *intended* to induce the City of Perham to breach its contract with Barlow. The Counties intended to renegotiate their contracts, the counties intended to force the City of Perham to breach its contract with Barlow. (Zylstra Aff. Ex. Y, BB, CC, EE, FF, GG)

Examining the four-corners of the Barlow Counterclaim, it is clear that the MCIT Board did not act arbitrarily and capriciously in determining the claims were based upon intentional acts by the Counties. The undisputed extrinsic evidence supports this conclusion. The Record in this case makes it clear that the MCIT Board took a hard look at the coverage issue, and exercised its judgment and not its will. The MCIT Coverage Document, agreed to by the Counties as members of MCIT, cannot be interpreted to provide coverage for the intentional acts by its members rather than accidental or fortuitous events. MCIT, through its members, has made a policy decision not to provide coverage for intentional acts such as the ones alleged in the Barlow Counterclaim. It is this type of decision, the allocation of public resources, that is entitled to deference in this Court's review. The challenged coverage decision by the MCIT Board was not arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, MCIT's Motion for Summary Judgment should be **GRANTED.**

**HANSON LULIC & KRALL, LLC**

Dated: June 5, 2007

By s/Joel W. Zylstra
   Tony R. Krall (#159694)
   Joel W. Zylstra (#0313907)
700 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Telephone: (612) 333-2530

**RATWIK, ROSZAK & MALONEY, P.A.**

Dated: June 5, 2007

By s/Jay T. Squires
Jay T. Squires, Esq.
300 U.S. Trust Building
730 Second Avenue South
Minneapolis, MN 55402
Telephone: (612) 339-0060

***Attorneys for Garnishee/Defendant on Supplemental Complaint Minnesota Counties Insurance Trust***

G:\HLK\19467\Pldg\SJ Memo.doc